UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

CAMBRIA COMPANY LLC,

                       Plaintiff,

v.

DISNEY WORLDWIDE SERVICES, INC.,

                       Defendant.

Civil No. 22-459 (JRT/JFD)

**MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S MOTION TO DISMISS**

Bryan R. Freeman, Jeremy Krahn, **MASLON LLP**, 3300 Wells Fargo Center, 90 South Seventh Street, Minneapolis, MN 55402, for Plaintiff.

Anna Tobin, Sybil L. Dunlop, **GREENE ESPEL PLLP**, 222 South Ninth Street, Suite 2200, Minneapolis, MN 55403, for Defendant.

Cambria Company LLC ("Cambria") brings this action against Disney Worldwide Services, Inc. ("Disney") asserting breach of contract, unjust enrichment, account stated, and promissory estoppel claims. Cambria alleges that Disney failed to pay more than $500,000 in invoices for Cambria quartz slabs that Cambria delivered to Disney. Disney moves to dismiss this action based on a lack of personal jurisdiction. The Court concludes Disney had fair warning of being sued in Minnesota when all contacts are considered together. Therefore, the Court will deny the Motion to Dismiss.

**BACKGROUND**

**I.    PARTIES**

Cambria is a Minnesota limited liability company with its principal place of business in Minnesota. (Compl. ¶ 5, Feb. 18, 2022, Docket No. 1.) Cambria designs, manufactures, and sells quartz surface products, which are commonly installed as countertops, islands, backsplashes, vanities, fireplace surrounds, or as tile in kitchens, bathrooms, and other spaces. (Decl. Kristin Skelley ("Skelley Decl.") ¶ 3, June 24, 2022, Docket No. 31.)

Disney is a Florida corporation with its principal place of business in Lake Buena Vista, Florida. (Compl. ¶ 6.)

**II.   BASIS FOR CLAIM**

Cambria filed this action on February 18, 2022, against Disney to recover "more than $500,000," which Cambria alleges Disney owes in partially unpaid invoices for quartz slabs that Cambria delivered to Disney. (*Id.* ¶ 1.) Cambria's claims arise out of a "Blanket Purchase Agreement – Quartz Master Agreement" ("the Agreement") entered into by the parties on April 14, 2016. (*Id.* ¶ 10.) Cambria alleges that Disney purchased, and Cambria supplied, 5,389 quartz slabs over nine distinct purchase orders for nine projects. (*Id.* ¶ 14.) Cambria alleges that it invoiced Disney in the total amount of $5,914,744.76, but that it has only received $5,396,256.23 from Disney. (*Id.* ¶¶ 17–18.) Cambria also alleges that Disney has been unjustly enriched by receiving quartz slabs and transportation services that Disney has not paid for. (*Id.* ¶ 23.) Specifically, Cambria alleges that Disney received the benefit of a discount Cambria calls "truckload-pricing"—where Disney

received an even lower price on the quartz slabs because it ordered enough to fill a truck, as compared to the per-slab cost in the Agreement—but now refuses to pay for the corresponding transportation cost. (*Id.*) Cambria estimates the value of the "truckload-pricing discounts" to be approximately $594,532. (*Id.* ¶ 24.)

### III. DISNEY'S CONTACTS WITH MINNESOTA

#### A. Contract Formation

In November 2015, Disney's Joe Motley met with Cambria's Mackenzie Weldon at a trade show in New York. (Decl. of Mackenzie Weldon ("Weldon Decl.") ¶ 3, June 24, 2022, Docket No. 32.) At that time, Joe Motley expressed interest in Cambria's quartz surface products for Disney projects. (*Id.*) They spoke again on or about November 19, 2015, this time over phone while Ms. Weldon was in Minnesota. (*Id.*) A different Disney employee, "Moe" Kashi, officially initiated the contract process by emailing Cambria's Courtney Bliss on or about January 14, 2016. (*Id.* ¶ 4.) Courtney Bliss was a Florida-based employee of Cambria who served as Cambria's Commercial Manager in Florida from 2014–2017. (Decl. of Katherine Sprague ("Sprague 1st Decl.") ¶ 7, June 3, 2022, Docket No. 23.)

Cambria claims that Mackenzie Weldon, who is based in Minnesota, was the primary communicator representing Cambria during negotiations. (Weldon Decl. ¶ 5.) Disney, on the other hand, claims that both Mackenzie Weldon and Courtney Bliss represented Cambria in the negotiations. (Sprague 1st Decl. ¶ 4.) Cambria rejects Ms.

Sprague's account and claims that "[o]ther than Moe Kashi reaching out to Ms. Bliss . . . Ms. Bliss did not have substantive involvement in forming the agreement with Disney."  (Weldon Decl. ¶ 6.)

There is also disagreement as to how the communications took place.  Cambria claims that contract negotiations happened over email and phone exclusively.  (Weldon Decl. ¶ 9.)  Disney claims that in addition to phone and email, some negotiations took place physically in Florida.  (Sprague 1st Decl. ¶ 5.)  Cambria does not dispute that no Disney employee ever visited Minnesota to negotiate the contract.

The Agreement included an address for each of the parties, with Disney residing in Florida, and Cambria residing in Minnesota.  (Decl. of Sybil L. Dunlop ("Dunlop Decl."), Ex. A, at 1, June 3, 2022, Docket No. 22.)  There is no choice of law or venue provision.  Though the Agreement initially included a Florida "Governing Law" clause, Cambria alleges that the clause was dropped entirely after Cambria objected.  (Weldon Decl. ¶ 8.)

The Agreement expired on October 1, 2021.  (Dunlop Decl., Ex. A, at 8.)  The Agreement stated that Cambria would "offer Disney special pricing below standard trade discounts" according to a pricing chart also in the contract.  (*Id.* at 8–9.)  The Agreement also stated that "[i]tems will be added to the scope as each project requires new products."  (*Id.* at 8.)  The Agreement included a project forecast with an estimated value range between $16.5 million and $21.2 million.  (*Id.* at 9.)

### B. Contract Performance

Over the course of performance, Cambria provided Disney with sample quartz slabs in Florida. (Sprague 1st Decl. ¶ 6.) Disney then submitted purchase orders to Belle Plaine, Minnesota. In total, Cambria shipped 5,389 quartz slabs to Disney in response to the purchase orders. (Skelley Decl. ¶ 8; Weldon Decl. ¶ 18.) Most of the orders placed by Disney were for truckloads of slabs, and each of those slabs was manufactured in Minnesota and transported through southern Minnesota to Disney. (Skelley Decl. ¶ 6.) The payments to Cambria were made to Cambria's bank in Illinois, not Minnesota. (Sprague 1st Decl. ¶ 9.)

Although Courtney Bliss served as Cambria's representative in Florida (*Id.* ¶ 7.), Disney also communicated directly with Cambria's staff in Minnesota regarding additional orders, changes to orders, pricing and availability of product, and "requests for slabs on an emergency basis." (Weldon Decl. ¶ 20.) Ms. Weldon estimates over 500 email communications between Moe Kashi and herself between 2016 and 2020. (*Id.* ¶ 21.)

Disney also communicated directly with Cambria staff in Minnesota over the missing payment dispute, including over email, phone conferences, and online meetings. (Weldon Decl. ¶ 22.)

### IV.   PROCEDURAL HISTORY

Cambria filed this action in the District of Minnesota on February 18, 2022, for breach of contract, unjust enrichment, account stated, and promissory estoppel. (Compl. ¶¶ 8–11.) In response, Disney filed the present Motion to Dismiss Disney's Complaint in

-5-

its entirety pursuant to Rule 12(b)(2).  (Mot. Dismiss Pl.'s Compl., Docket No. 17.)  Disney argues that the Court lacks personal jurisdiction over it because Disney has not had the requisite contacts with Minnesota.  (Def.'s Mem. Supp. Mot. at 1, Docket No. 19.)

## DISCUSSION

### I. STANDARD OF REVIEW

A plaintiff must allege sufficient facts in the complaint supporting a reasonable inference that the Court can exercise personal jurisdiction over the defendant.  *Wells Dairy, Inc. v. Food Movers Int'l, Inc.*, 607 F.3d 515, 518 (8th Cir. 2010).  When personal jurisdiction is challenged, the plaintiff "must make a prima facie showing that personal jurisdiction exists, which is accomplished by pleading sufficient facts to support a reasonable inference that the defendant[] can be subjected to jurisdiction within the state." *K-V Pharm. Co. v. J. Uriach & CIA, S.A.*, 648 F.3d 588, 591–92 (8th Cir. 2011) (internal quotations omitted).  Although the evidence necessary to make that prima facie showing is minimal, it must be "tested" by "affidavits and exhibits supporting or opposing the motion."  *Id.* at 592 (internal quotations omitted).  The evidence must be viewed in the light most favorable to the plaintiff, with all factual conflicts in its favor.  *Id.*

Personal jurisdiction in a diversity case exists to the extent permitted by the long-arm statute of the state.  *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985). Minnesota's long-arm statute authorizes courts to exercise jurisdiction to the fullest extent allowed by the Due Process Clause.  *See Johnson v. Woodcock*, 444 F.3d 953, 955 (8th Cir. 2006) ("Minnesota's long-arm statute is coextensive with constitutional limits.").

-6-

Due process requires that the defendant purposefully establish "minimum contacts," meaning that "the defendant's conduct and connection with the forum State are such that [they] should reasonably anticipate being haled into court there." *Burger King Corp.*, 471 U.S. at 474 (internal citation omitted).

Presuming that a party has minimum contacts with a forum, the Due Process Clause forbids personal jurisdiction when it is unreasonable because it "would offend traditional notions of fair play and substantial justice." *Creative Calling Sols., Inc. v. LF Beauty Ltd.*, 799 F.3d 975, 981–82 (8th Cir. 2015) (internal quotation omitted).

**II.   ANALYSIS**

The Eighth Circuit has established a five-factor balancing test to determine whether sufficient minimum contacts exist for personal jurisdiction: "(1) the nature and quality of the contacts with the forum state; (2) the quantity of the contacts; (3) the relationship of the cause of action to the contacts; (4) the interest of [the forum state] in providing a forum for its residents; and (5) the convenience or inconvenience to the parties." *Johnson v. Arden*, 614 F.3d 785, 794 (8th Cir. 2010) (internal citation omitted). The first three factors are primary, but all five must be considered together. *Id.* The third factor determines whether personal jurisdiction is specific or general. *Id.* Factors four and five assess whether the exercise of jurisdiction is reasonable. *Creative Calling Sols., Inc.* 799 F.3d at 982.

Although the Court is guided by the factors identified by the Eighth Circuit, personal jurisdiction "does not turn on 'mechanical tests' or on conceptualistic theories

-7-

of the place of contracting or of performance." *K-V Pharm. Co.*, 648 F.3d at 593 (quoting *Burger King Corp.*, 471 U.S. at 478). Rather, due process requires that the exercise of personal jurisdiction "does not offend 'traditional conceptions of fair play and substantial justice.'" *Id.* at 592 (quoting *Burger King Corp.*, 471 U.S. at 464).

### A. Nature and Quality of Contacts

The nature and quality of contacts between Disney and the forum state favor personal jurisdiction because both the formation and the performance of the Agreement provided Disney with fair warning of being sued in Minnesota. *See Cambria Co., LLC v. Pental Granite & Marble, Inc.*, No. 12-228, 2013 WL 1249216, at *6 (D. Minn. Mar. 27, 2013) ("When looking to the nature and quality of the contacts, the central question is 'whether the defendant had fair warning of being sued in Minnesota.'")

The formation of the Agreement weighs in favor of personal jurisdiction. Where the defendant "has created continuing obligations between [itself] and residents of the forum, [it] manifestly has availed [itself] of the privilege of conducting business there." *Burger King Corp.*, 471 U.S. at 475-76 (internal quotation omitted). Although the existence of a contract alone is not sufficient, a contract is "ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transactions." *Id.* at 479 (internal quotation omitted). And it is those "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing [ ]that must

be evaluated in determining whether the defendant purposefully established minimum contacts within the forum." *Id.*

In this case, Disney knew that Cambria was based in Minnesota when it entered the Agreement and that Cambria's products were made in Minnesota. In fact, Disney sought out Cambria's products by initiating contract negotiations through phone calls to a representative in Minnesota. *See, e.g., Creative Calling Sols., Inc.* 799 F.3d at 980 (8th Cir. 2015) (finding the defendant's initiation of a business relationship with a plaintiff in the forum state to be an important factor in determining availment). The parties disagree as to whether Cambria's Florida representative was involved in negotiations, but at the motion to dismiss stage factual conflicts must be resolved in favor of the non-moving party. Therefore, the Court assumes that Disney negotiated only with Cambria's Minnesota based staff as set forth in the Complaint.[1]

It is also relevant that Disney did not engage in an isolated or one-off transaction. Rather, it entered a multi-year contractual relationship that envisioned the purchase of millions of dollars' worth of products involving substantial coordination between the parties, exactly the kind of continuing obligation envisioned by the Supreme Court in *Burger King Corp.*

---

[1] Even assuming that at least some negotiations took place in Minnesota, it would not alter the outcome.

The Agreement's performance also favors personal jurisdiction. Although it appears Cambria provided a Florida-based representative to assist with orders, Disney does not dispute that it placed orders directly with the staff in Minnesota. Disney also makes much of the fact that none of its staff entered Minnesota, but that is not dispositive. Disney did not simply walk into the Cambria store in Florida to place orders for quartz slabs from a company that happened to be based in Minnesota. As the Supreme Court recognized, "jurisdiction in these circumstances may not be avoided merely because the defendant did not *physically* enter the forum state," because "it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted." *Burger King Corp.,* 471 U.S. at 476 (emphasis in original). In other words, but for advancements in technology, Disney would have traveled to Minnesota to negotiate the Agreement, to place orders, to make changes to those orders, to request pricing, and to make emergency orders. Therefore, the nature and quality of Disney's contact with Minnesota favor personal jurisdiction.[2]

---

[2] Disney argues that this case is like another case from this district in which the court determined it did not have personal jurisdiction over a non-resident: *CHS Inc. v. Farmers Propane Inc.*, 397 F. Supp. 3d 1324 (D. Minn. 2019). It is not. First, the case is not binding on this Court. And second, in *CHS Inc.*, the out-of-state defendant—Farmers Propane—had a contract to purchase propane from CHS for delivery in Ohio, and subsequently sold that propane to customers in Ohio, Indiana, and Pennsylvania—but not Minnesota. *CHS Inc.*, 397 F. Supp. 3d at 1331. Although the contract had a Minnesota choice-of-law provision and the payments were

### B. Quantity of Contacts

The quantity of contacts also weighs in favor of personal jurisdiction. Disney argues that the quantity of the contacts with Minnesota in this case is negligible, but that is not so. Both the communications and purchase orders are sufficiently numerous to support personal jurisdiction.

Cambria pleads extensive communication between the parties. Disney communicated directly with Cambria's staff in Minnesota to purchase quartz slabs, to discuss truckload pricing, to place and modify orders, to confirm pricing and product availability, and to request slabs on an emergency basis. Cambria estimates more than 500 email communications were sent from Disney's Moe Kashi alone between 2016 and 2020.

Disney argues that it takes regular communications over an extended period, for example 12 years, to establish sufficient contacts to support personal jurisdiction. Disney cites to *K-V Pharm. Co.* 648 F.3d at 595 (8th Cir. 2011), and *Eagle Tech. v. Expander*

---

sent to Minnesota, the court found that these contacts were not sufficient to confer personal jurisdiction. *Id.* In particular, the court highlighted that CHS conceded it had an Ohio-based sales representative that "may have been the primary point of contact for Farmers Propane when it was purchasing propane." *Id.*

In contrast, Cambria alleges that Disney negotiated and placed orders with Minnesota-based staff. The underlying subjects of the contracts matter as well. The purchasing of quartz slabs ordered from Cambria necessitates a higher degree of cooperation and involvement from the staff in Minnesota than purchasing propane. Although Disney did not visit Minnesota and may have received samples in Florida, it was not ordering a commodity that may just as easily been ordered from another company.

*Americas, Inc.*, 783 F.3d 1131, 1137 (8th Cir. 2015).  However, these cases are distinguishable because they involved situations where personal jurisdiction was alleged solely on communications between the parties.  In fact, even a single transaction can be enough to justify the exercise of personal jurisdiction "if that single contact was deliberate." *Pope v. Elabo GmbH,* 588 F. Supp. 2d 1008, 1021 (D. Minn. 2008).

The amount of product purchased is also relevant.  Cambria does not allege a simple internet transaction or one-time purchase.  Rather, Cambria alleges that Disney bought more than 5,000 quartz slabs over 5 years—at a cost of more than $5 million—and the Agreement contemplated even more orders.  Each of the purchase orders was sent to Minnesota.

On their own, none of these contacts may be sufficient to establish personal jurisdiction.  But, considered together, they favor personal jurisdiction.

### C. Relation of Cause of Action to Contacts

Factor three distinguishes between general and specific jurisdiction.  *Johnson v. Arden*, 614 F.3d at 794.  To support specific as opposed to general jurisdiction, the contacts of the defendant must be directly related to the causes of action alleged in the complaint.  Disney's contacts with the forum state are clearly related to the cause of action alleged in the complaint.  Cambria is suing Disney for its alleged failure to pay under the Agreement.  Since the cause of action is related to Disney's contact with Minnesota, this factor supports specific jurisdiction.

### D. Interest of Forum State and Convenience of Parties

The fourth factor is easily met in this case as Minnesota has a strong interest in providing a forum to its residents' disputes, and Cambria is a Minnesotan corporation. *See Burger King Corp.*, 471 U.S. at 473 ("A State generally has a 'manifest interest' in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors.").

The fifth factor—convenience to the parties—narrowly favors Disney. A central issue in this case will be what products were received by Disney in Florida. Furthermore, Cambria has a presence in Florida. Most of the relevant third parties also reside in Florida. Therefore, a substantial amount of the evidence in question is already in Florida in one way or another. On the other hand, Disney did not identify any specific or significant burden to defending itself in Minnesota. Although this factor favors Disney, it is not enough to outweigh the other factors.

## CONCLUSION

Because Disney had sufficient contacts with Minnesota, the Court finds that it has personal jurisdiction over Disney. Accordingly, it will deny Disney's Motion to Dismiss.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendant's Motion to Dismiss [Docket No. 17] is **DENIED.**

DATED:  January 17, 2023
at Minneapolis, Minnesota.

　　　　　　　　　　　　　　　　　　　　　　　　JOHN R. TUNHEIM
　　　　　　　　　　　　　　　　　　　　　　　　United States District Judge